JS-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3481 | **DATE** | 8/22/2002 |
| **CASE TITLE** | Pamela A. Bloomer vs. Rodney E. Slater | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by agreement/pursuant to]
　　☐ FRCP4(m)　☐ Local Rule 41.1　☐ FRCP41(a)(1)　☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Defendant's motion for summary judgment (23-1) is granted. Judgment is entered in favor of Defendant and against Plaintiff.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | AUG 23 2002 | 33 |
| | Docketing to mail notices. | | date docketed | |
| ✓ | Mail AO 450 form. | | CV | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | |
| | | | 8/22/2002 | |
| ETV | courtroom deputy's initials | | date mailed notice | |
| | | | ETV | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PAMELA A. BLOOMER,              )
                               )     No. 00 C 3481
              Plaintiff,       )
                               )     Judge Pallmeyer
      v.                       )
                               )
RODNEY E. SLATER, Secretary    )
Department of Transportation,  )
Federal Aviation Administration, )
                               )     AUG 2 1 2002
              Defendant.       )

## MEMORANDUM OPINION AND ORDER

After months of training, Plaintiff Pamela Bloomer remained demonstrably incapable of performing her job as an air traffic controller. She now brings this *pro se* action against Rodney Slater in his capacity as administrator of the Federal Aviation Administration ("FAA" or the "Agency"). Plaintiff alleges that the FAA violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq*, by engaging in sexual discrimination, creating a hostile work environment, and retaliating when Plaintiff complained about the harassment to the EEOC and filed a union grievance. Defendant moves for summary judgment on each of Plaintiff's claims. For the reasons set forth below, Defendant's motion is granted.

## FACTUAL BACKGROUND

The Agency met its Local Rule 56.2 obligation to provide Plaintiff notice of her responsibilities in responding to a summary judgment motion. At the outset of her memorandum in opposition to Defendant's motion for summary judgment, Plaintiff states: "At the time I submitted these statements I did not realize the importance of signing them with a statement that I was swearing to their truth. I will not state that I swear that all of the information in this brief and in the attachments and in everything that I have said and submitted relating to this allegation is true to the best of my knowledge, information and belief." Plaintiff's

1



refusal to comply with the requirements of Rule 11 is, at a minimum, ill-advised. And her failure to meet the obligations of Rule 56.1 would arguably justify this court's review of Defendant's motion for summary judgment without any reference to Plaintiff's response. As explained below, however, even if Plaintiff had not discredited every assertion she makes, she would not prevail against this summary judgment motion. The material facts are not in dispute, and they demonstrate that Defendant is entitled to judgment in his favor as a matter of law.

## A. Plaintiff's Employment History

On August 27, 1990, the Agency hired Plaintiff as a trainee for an Air Traffic Control Specialist position, in which she would be responsible for monitoring and directing airplane flight paths. (Defendant's Rule 56.1 Narrative Statement of Facts and Material Statement of Facts Which Are Not in Dispute, In Support of Defendant's Motion for Summary Judgment (hereinafter "Def.'s 56.1 St.") ¶ 1.) After successfully completing the classroom portion of training in Oklahoma City, Plaintiff began Local Control on-the-job training ("OJT") at the Springfield, Illinois ("SPI") Air Traffic Control Tower ("ATCT") on December 16, 1990. (Def.'s 56.1 St. ¶ 2.) Under the Agency's Instructional Program Guide ("IPG"), a trainee is allowed a maximum of 180 hours of OJT to become certified for Local Control. (Def.'s 56.1 St. ¶ 3.) The Agency uses an OJT Instruction/Evaluation Report to record each OJT session and each trainee evaluation. (Def.'s 56.1 St. ¶ 4.) In addition, trainers prepare monthly training summaries recording the number of training hours completed in the month, the total training hours completed, the trainee's strengths and weaknesses, and an overall summary rating. (Def.'s 56.1 St. ¶ 4.)

From July 1991 through November 1991, Plaintiff's OJT instructors reported many deficiencies in her performance, including problems in areas such as awareness, control judgment, and the appropriate use of air traffic control terms. (Def.'s 56.1 St. ¶ 5.) On January 7, 1992, Plaintiff received an unsatisfactory evaluation which stated that she needed to improve

in several areas, but ultimately recommended that she continue OJT. (Def.'s 56.1 St. ¶ 7.) Plaintiff's overall evaluation for the month of January 1992 was unsatisfactory. In response, she requested the opportunity to work on different shifts in order to gain experience with busier traffic, and this request was granted. (Def.'s 56.1 St. ¶ 8; Plaintiff's Response to Def.'s 56.1 St. ("Plf.'s 56.1 Resp.") ¶ 8.)

On February 1, 1992, a periodic OJT evaluation was conducted, and Plaintiff's area supervisor, William Copp, recommended that her training be suspended. (Def.'s 56.1 St. ¶ 9.) Copp issued a written notice the following day, however, in which he authorized Plaintiff to continue training for 35 more hours and identified several issues she needed to work on to raise her performance to a satisfactory level. (Def.'s 56.1 St. ¶ 9; February 2, 1992 Notice from William Copp to Pamela Bloomer, Exhibit 5 to Def.'s 56.1 St.) Copp's notice also warned that if her performance did not improve and she again received a suspend-training recommendation, her OJT would be terminated. (Def.'s 56.1 St. ¶ 9; February 2, 1992 Notice to Pamela Bloomer, Exhibit 5 to Def.'s 56.1 St.)

Plaintiff met with Agency officials and a union representative on February 10, 1992 to protest her February evaluation, alleging that it was unfair because air traffic was heavy during her evaluation and the evaluator confused her by asking questions. (Def.'s 56.1 St. ¶ 10.) At the meeting, the parties agreed that Plaintiff would receive another evaluation, and that if the evaluation recommended Plaintiff's training continue, it would replace her existing evaluation; however, if the evaluation recommended suspension of her training, it would confirm the first evaluation. (Def.'s 56.1 St. ¶ 11.) The parties further agreed that Plaintiff would be transferred to train with a different crew, a transfer Plaintiff desired because the trainers for the new crew had less stringent standards than the trainers on her previous crew. (Def.'s 56.1 St. ¶ 11; Plf's 56.1 Resp. ¶ 11.) Plaintiff acknowledges that she requested the crew change because she believed that it would be easier to become certified in the other crew. (Plf's 56.1 Resp. ¶ 11.)

The reevaluation to which the parties agreed in the February 10, 1992 meeting was conducted the following day, and Plaintiff was again given an unsatisfactory rating and a suspend-training recommendation. (Def.'s 56.1 St. ¶ 12.) Supervisor William Failor reviewed the results of this reevaluation, and confirmed Copp's earlier notice that her training should be terminated if she did not improve sufficiently after 35 more hours of training. (Def.'s 56.1 St. ¶ 12; February 12, 1992 Notice from William Failor to Pamela Bloomer, Exhibit 9 to Def.'s 56.1 St.)

Plaintiff continued OJT until February 29, 1992, when she went on sick leave. (Def.'s 56.1 St. ¶ 14.) When she returned from leave on March 16, the Agency allowed Plaintiff to resume OJT until April 8 without counting her hours towards the 180-hour limit so that she could return to her pre-sick-leave level of proficiency. (Def.'s 56.1 St. ¶ 14.) Plaintiff alleges that when she returned, "many of the male controllers were wondering if [she] was getting breast implants during [her] sick leave" and that this made her "extremely uncomfortable . . . at a time when she was trying to concentrate on keeping [her] job."[1] (Plf's 56.1 Resp. ¶ 14.)

Plaintiff resumed regular training on April 9, 1992. On May 20, when she had completed the additional recommended 35 hours of training (a total of 178 of the 180 allowed hours), Plaintiff was again evaluated. (Def.'s 56.1 St. ¶ 15.) Again, her performance was rated unsatisfactory, and this time, it was recommended that her training be terminated.[2] (Def.'s 56.1 St. ¶ 15.) By letter dated June 1, 1992, Failor notified Plaintiff that her training was being terminated because of her unsatisfactory progress. (Def.'s 56.1 St. ¶ 16.) Plaintiff responded to this termination notice by letter dated June 8, 1992, in which she stated that she believed there were discrepancies in her training and that she would discuss them when her union

---

[1]    Plaintiff did not explain how she knew that some of the male controllers were wondering whether she underwent breast implant surgery.

[2]    The Agency did not identify which trainer recommended termination at this point in time.

representative was present. (Def.'s 56.1 St. ¶ 17.) Plaintiff also filed an informal EEO complaint and an informal union grievance. (Def.'s 56.1 St. ¶ 17-18.)

On either June 17 or 18, 1992, Plaintiff and some unidentified Agency representatives met to attempt to resolve Plaintiff's complaints regarding her training and termination.[3] (Def.'s 56.1 St. ¶ 19.) The Agency ultimately acknowledged that Plaintiff's performance had been satisfactory for her first 100 OJT hours, and therefore, decided effectively to turn back the clock and allow Plaintiff an additional 80 hours of OJT to permit her again to try to qualify on Local Control. (Def.'s 56.1 St. ¶ 19.) The Agency also allowed Plaintiff additional training hours sufficient to return her to the level of proficiency she had attained when she was at 100 hours of OJT, without counting those hours against the additional 80 to achieve Local Control certification. (Def.'s 56.1 St. ¶ 19.) The parties also agreed that Plaintiff would not be required to work with the trainers, evaluators, and/or certifiers with whom she did not get along or who enforced what she believed to be excessively high standards. (Def.'s 56.1 St. ¶ 19.) In exchange for the additional training hours, Plaintiff agreed to withdraw her EEO complaint and union grievance and to make a prompt report concerning any form of unfair treatment to her supervisor, Del Meadows, the assistant air traffic manager, or the facility manager. (Def.'s 56.1 St. ¶ 20.)

Plaintiff did attain her 100 hour level of proficiency after undertaking additional training from June 21, 1992 to July 15, 1992, and resumed actual OJT on July 16, 1992. (Def.'s 56.1 St. ¶¶ 22-23.) From this time until her termination in December 1992, the monthly training summaries document Plaintiff's difficulties. On August 19, 1992, after Plaintiff had received 126 hours and 1 minute of OJT, Mr. Fant, one of Plaintiff's preferred certifiers, evaluated her and recommended that she be "watched for certification on Local Control." (Def.'s 56.1 St. ¶ 23.) In his August 1992 summary evaluation, Plaintiff's supervisor Mr. Meadows reported,

---

[3] The parties did not identify who besides Plaintiff attended this meeting, nor does the record reveal why the Agency did not follow through with Plaintiff's termination at this point.

among other problems, that Plaintiff appeared to have difficulty with control judgment, was not able to ensure smooth air traffic flow, and on three occasions, had not ensured separation between aircraft. (Def.'s 56.1 St. ¶ 24.) Plaintiff received 19 hours and 56 minutes of OJT in September, and Mr. Meadows again rated her performance as unsatisfactory, citing five incidents in which Plaintiff had difficulty ensuring separation between aircraft, and a continuing problem with control judgment. (Def.'s 56.1 St. ¶ 25.) On October 3, 1992, Plaintiff received yet another unsatisfactory evaluation from Mr. Meadows, and he recommended that her OJT be suspended. (Def.'s 56.1 St. ¶ 26.) Plaintiff received additional classroom instruction and resumed OJT on October 8, 1992. (Def.'s 56.1 St. ¶ 26.)

On October 19, 1992, Plaintiff requested a transfer to either the Milwaukee Timmerman ATCT or the Palwaukee ATCT to be closer to her grandmother, who needed assistance and lived in Milwaukee. (Def.'s 56.1 St. ¶ 27.) Plaintiff's request was denied, at least in part because Mr. Meadows considered Plaintiff's training status unsatisfactory. (Def.'s 56.1 St. ¶ 27.) George Acres, Springfield ATCT manager, denied Plaintiff's request for a hardship transfer on November 12, 1992, and recommended that she complete the training requirements, and if successful, then reapply for a transfer.[4] (Def.'s 56.1 St. ¶ 28.)

In November 1992, Plaintiff completed the last of the 80 additional training hours she had received under the June 1992 arrangement, and received still another unsatisfactory evaluation. (Def.'s 56.1 St. ¶ 29.) On December 1, 1992, Mr. Meadows completed a further evaluation report, noting Plaintiff had completed her OJT hours but that her performance remained unsatisfactory. (Def.'s 56.1 St. ¶ 30.) Mr. Meadows concluded that Plaintiff did not meet the necessary training objectives and recommended that her training be terminated. (Def.'s 56.1 St. ¶ 30.) On December 4, 1992, Mr. Meadows gave Plaintiff formal notice of the

---

[4] It is not clear from the record whether the hardship request denied by Acres on November 12 was the same request she had made on October 19, for transfer to either Milwaukee or Palwaukee.

termination of her training due to her unsatisfactory progress achieving Local Control skills. (Def.'s 56.1 St. ¶ 31.)

Plaintiff filed an informal union grievance in response to this decision. Plaintiff's grievance raised issues such as inconsistent training hours and "training negative in nature," but made no reference to alleged discrimination, harassment or bias. (Def.'s 56.1 St. ¶ 32.) Plaintiff participated in a grievance meeting on December 14, 1992, and on December 15, in a written letter addressing each of Plaintiff's concerns, Meadows denied Plaintiff's grievance. (Def.'s 56.1 St. ¶ 33.) Plaintiff responded by filing a formal union grievance on December 28, 1992 in which she alleged 44 violations of the Agency's regulations, orders and collective bargaining agreements. (Def.'s 56.1 St. ¶ 34.) In addition to exercise of union rights, on December 11, 1992, Plaintiff contacted an EEO counselor and on February 4, 1993 she filed a formal complaint of sex discrimination and retaliation. (Def.'s 56.1 St. ¶ 35.)

In the meantime, on January 22, 1993, the manager of the Springfield ATCT proposed Plaintiff's removal due to her unsatisfactory evaluations from June 1991 through December 1992.[5] (Def.'s 56.1 St. ¶ 36.) Plaintiff was removed as a development air traffic controller trainee on March 6, 1993. (Def.'s 56.1 St. ¶ 36.)

The Agency initially dismissed Plaintiff's EEO complaint, but the Equal Employment Opportunity Commission ("EEOC") reversed that decision, and ordered the Agency to proceed with an investigation of Plaintiff's complaint.[6] (Def.'s 56.1 St. ¶ 37.) On March 21, 1996, the

_____

[5]     The parties did not explain how this January "removal" differs or relates to the termination of her training a month earlier.

[6]     During the intervening period, Plaintiff's union withdrew her December 1992 union grievance from arbitration, leading Plaintiff to file an unfair labor practice charge against the union, which was denied in February 1995. (Def.'s 56.1 St. ¶ 38.) The Agency's EEO investigation took place from February through April 1995. (Def.'s 56.1 St. ¶ 37.) Several union members declined to participate in that investigation. (Def.'s 56.1 St. ¶ 39.) The parties disagree as to the members' reasons: the Agency asserts they did not want to be interviewed because they feared a possible lawsuit against them by the Plaintiff, but Plaintiff claims they feared retaliation for cooperating with
(continued...)

agency issued its final decision on the Plaintiff's EEO complaint, finding no sex discrimination or retaliation. (Def.'s 56.1 St. ¶ 40.) Plaintiff appealed to the Merit Systems Protection Board ("MSPB"), which also concluded that Plaintiff was not subjected to sex discrimination or retaliation. (Def.'s 56.1 St. ¶ 41.) Plaintiff petitioned for review of the MSPB's initial decision and on July 29, 1998, the full Board of the MSPB affirmed the earlier decision and advised Plaintiff she could appeal to the EEOC. (Def.'s 56.1 St. ¶ 42.) On August 29, 1998, Plaintiff appealed to the EEOC, Office of Federal Operations ("OFO"). (Def.'s 56.1 St. ¶ 43.) On October 8, 1999, that office reviewed the record, affirmed the MSPB's finding, and advised Plaintiff of her appeal rights to an appropriate United States District Court. (Def.'s 56.1 St. ¶ 43.)

Plaintiff filed a complaint in the United States District Court for the Eastern District of Wisconsin on November 19, 1999. (Def.'s 56.1 St. ¶ 44.) The case was traasnferred to this court on June 12, 2000. (Def.'s 56.1 St. ¶ 45.) Defendant has now moved for summary judgment arguing that it dismissed Plaintiff solely because she was incapable of performing the responsibilities of an air traffic controller.

**B.    Plaintiff's Sexual Discrimination Claims**

Plaintiff did not offer a statement of additional facts pursuant to LRL56.1, but in her memorandum in opposition to Defendant's summary judgment motion, she describes generally the alleged facts surrounding her discrimination and harassment claims. As noted earlier, Plaintiff has explicitly refused to attest to the truth of her statements. Nonetheless, the court will summarize those allegations here.

**1. Alleged Disparate Treatment**

---

[6](...continued)
the investigation. (Plf's 56.1 Resp. ¶ 39.) Form letters from some of the potential witnesses to their supervisor, George Acres, tend to support Plaintiff's version: in those form letters, the witnesses decline to meet with the investigator, stating, "I reasonably believe that disciplinary action may result from the meeting." (Exhibit 32 to Def.'s 56.1 St.)

Plaintiff alleges that she has been subjected to sexual discrimination since she began working at the Control Tower. Plaintiff claims that from the time she began working at the facility, the men in her crew held the false belief that Diane Arendt, a female coworker, and Plaintiff had been part of a training class in Oklahoma City that had failed the training program, filed a class EEO complaint, and were "recycled" into the next training program.[7] (Pro Se Plaintiff's Memorandum In Opposition to Defendant's Motion for Summary Judgment (hereinafter "Plf's Memo"), at 2.) Plaintiff complains that the controllers in her crew "believed that if [she] didn't pass the training program it was because [she] wasn't able to perform satisfactorily."[8] (Plf's Memo at 2.)

In this response, Plaintiff raises for the first time a claim that Defendant discriminated against her by not providing her adequate classroom training. Plaintiff alleges that she discovered much later that the males in the group had received many more hours of classroom training than she and Diane Arendt did before beginning their training for Local Control.[9] (Plf's Memo at 3.) Plaintiff also asserts that the men began OJT within a short time frame of completing the classroom, whereas Plaintiff's training did not begin until more than a month later. (Plf's Memo at 4.) All of this leads Plaintiff to conclude that, had her training been of the quality it should have been, her performance would have been much better.

Diane Arendt, the other woman with the same amount of classroom hours as Plaintiff, successfully completed Local Control training. (Defendant's Reply to Plf's Memo at 1; Plf's

---

[7]     Plaintiff provides no evidentiary basis for these assertions, and offers no explanation as to how she came to know about her coworkers' alleged beliefs. Nor has Plaintiff explained how the beliefs of her coworkers constituted discrimination by her managers.

[8]     Plaintiff appears to miss the import of these statements: she asserts that the controllers doubted her abilities based on their alleged misconception that she had already failed the program once, and that she could not perform satisfactorily. Neither of these issues relate to her sex; they relate instead to a track record (true or not) of poor performance and insufficient skills, patently non-discriminatory reasons for her termination.

[9]     Plaintiff does not explain when or how she learned that the males in her group had allegedly received many more classroom hours than Arendt and herself.

Memo at 2.) The MSPB concluded that Plaintiff received all of the required classroom training. (Defendant's Reply to Plf's Memo at 2; Decision of Merit Systems Protection Board, December 30, 1997, Exhibit 34 to Def.'s 56.1 St.) Furthermore, the court notes that when Plaintiff counted the hours of classroom training she and Diane Arendt received, she counted only those hours they received at SPI after training in Oklahoma City, while it is not at all clear that she makes the same distinction with respect to her male counterparts. Plaintiff acknowledges that the males in the training group with her and Arendt had previously been fully trained at other facilities, or had already been certified on Ground Control when they received classroom training for Local Control. (Plf's Memo at 4.) She nevertheless discards the possibility that it was this far more significant experience, rather than the alleged additional classroom training, that enabled male trainees to succeed at Local Control. Plaintiff does not suggest that the men in her group received more classroom hours on Local Control at SPI, and she admits that, the SPI training was her own and Diane Arendt's first introduction to Local Control, while for the men it was a refresher course. (Plf's 56.1 Resp. ¶ 7) As noted earlier, Diane Arendt did pass the training. The court notes, furthermore, that Plaintiff's satisfactory performance for her first 100 hours of OJT severely undermines her insistence that her classroom training was inadequate.

Plaintiff additionally claims that there were different standards of training on each crew, and that she was assigned to the crew with the highest standards. (Plf's Memo at 5.) Her effort to characterize this circumstance as discrimination is unsuccessful; Plaintiff acknowledges that there were also men on this more demanding crew, and that the men also had difficulty meeting the high standards. (Plf's Memo at 5-6.) She acknowledges, further, that the managers granted her request for a transfer to a crew with allegedly lower standards to complete her training. (Plf's Memo at 5.) And finally, in her own memorandum, she admits that being placed on the more difficult crew was not discrimination: "Obviously I don't think that being placed on a

crew with high standards was discriminatory given a male also had problems meeting this crew's expectations." (Plf's Memo at 6.)

## 2. Alleged Hostile Environment

In addition to her assertions of disparate treatment, Plaintiff alleges that she experienced a hostile work environment on the basis of sex. Plaintiff claims that there was a rumor circulating that Plaintiff was having an affair with her supervisor and several other men at the facility, that her coworkers believed the rumors, and that they began treating her in a hostile manner. (Plf's Memo at 6-7.) Plaintiff does not identify who treated her in a hostile manner, nor does she specify what sort of hostile behavior she encountered or when she encountered it. She does allege, however, that her performance suffered as a result of the hostility and rumors, ultimately resulting in her termination. (Plf's Memo at 11, 14.) Plaintiff asserts that comments occurred "on a daily basis," but she fails to identify the nature of the comments or the individual(s) who made them, instead insisting that given the opportunity, she could "demonstrate at trial and call several witnesses to support this." (Plf's Memo at 14.)

Plaintiff believes that the experiences of Marlene Swofford, another woman working and training at SPI ATCT, also support her claims. According to Plaintiff, Swofford advised the EEO Counselor that Swofford herself felt she was discriminated against on the basis of her sex when she trained with the more difficult crew.[10] (Plf's Memo at 7.) Swofford successfully completed Local Control training, though it is not clear on what date. (EEO Counselor's Report, Plaintiff's Exhibit 6.) Plaintiff claims that when the controllers saw the statement Swofford gave, they began to harass Swofford, and retaliated against Swofford for cooperating with the investigation of Plaintiff's lawsuit. (Plf's Memo at 7.) Again, Plaintiff does not explain how she came to know that the other controllers saw Swofford's statement, does not identify any comments or

---

[10]     It is not clear when Swofford trained with "more difficult" crew.

instances of harassment directed at Swofford, and does not provide any supporting affidavit or other evidence from Swofford herself.

Although she made no effort to comply with Local Rule 56.1(b), Plaintiff attached a number of exhibits to her memorandum in opposition to Defendant's summary judgment motion, consisting primarily of various letters and memoranda Plaintiff wrote over the years as she pursued this matter through various administrative levels. In an effort "to not triple the length of this brief," Plaintiff "simply enclos[ed]" those materials. (Plf's Memo at 2.) Those documents might contain some of the specificity the court finds wholly absent from Plaintiff's brief, but the court has already given Plaintiff great leeway: First, with respect to her flagrant refusal to comply with Rule 11; and again, in considering the facts she did set forth in her brief in response to Defendant's summary judgment motion as if they had been properly presented in a Local Rule 56.1(b) statement of additional facts. The court declines Plaintiff's invitation to sift through the years of correspondence she attached to her brief to see what, if any, additional allegations she raised therein. In considering her hostile work environment claim, the court will address the only two comments Plaintiff mentioned in her many pages of exhibits that are remotely probative of a hostile work environment claim: First, Plaintiff alleged that a co-worker told her that only "collars" could go in the pool hall where a union meeting was being held, and second, Plaintiff alleged that her supervisor said: "If God had meant women to be pilots he would have made the sky pink."

Plaintiff offers no explanation for her failure to provide evidence as required in response to Defendant's motion. She complains that the Agency did not cooperate with discovery requests, destroyed documents and refused to produce documents regarding similarly situated individuals. (Plf's Memo at 9-10.) She asserts that "individuals from the beginning have been putting up road blocks" in her attempts to get affidavits, (Plf's Memo at 9), but the court is

unpersuaded: Plaintiff served no discovery requests at all until directed by the court to do so, and never filed a motion to compel further responses.

## DISCUSSION

**A.    Summary Judgment Standard**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56 (c); *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462 (7th Cir. 2002). In making this determination, the court will construe facts and draw inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The nonmoving party may not "merely allege the existence of a factual dispute to defeat summary judgment," however, but must instead offer evidence sufficient to support a verdict in his favor. *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001), *quoting McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558 563 (7th Cir. 2000). The non-moving party must demonstrate through specific factual allegations that there is a genuine issue of material fact that requires a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

**B.    Plaintiff's Sexual Discrimination Claims**

In employment discrimination cases, a plaintiff may proceed either by offering direct evidence that the challenged employment action was motivated by a sexually discriminatory motive, or she can proceed under the burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).    Plaintiff offers no direct evidence of sex discrimination here.

In order to prove a claim of sex discrimination under the burden-shifting approach, Plaintiff must establish that: (1) she is a member of a protected class; (2) she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) the Defendant treated

similarly situated employees outside her class more favorably. *Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873, 876 (7th Cir. 1999). If Plaintiff can establish a prima facie case of sex discrimination, Defendant must articulate a legitimate, non-discriminatory reason for Plaintiff's termination. *See Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 289 (7th Cir. 1999). Plaintiff then bears the burden of proving that the reasons offered by Defendant are merely pretext. *See id.*

Here, Plaintiff fails to make a prima facie showing of discrimination because she cannot establish that she performed her job satisfactorily. The FAA states that Plaintiff was terminated because of her unsatisfactory work performance, and the record is replete with examples of Plaintiff's negative reviews and evaluations. Indeed, fatal to Plaintiff's prima facie case, Plaintiff does not dispute that she was performing poorly and does not contest the accuracy of her very poor evaluations. Instead, she blames her poor performance on the hostile environment she suffered. Plaintiff has offered no evidence of actionable harassment, however, and her acknowledgment that she was not performing up to Defendant's standards defeats her prima facie case of discriminatory discharge. Nor has she offered any evidence that other similarly situated male employees were treated more favorably.

Even if Plaintiff had made a prima facie showing, Defendant's legitimate and non-discriminatory reason for her termination--demonstrable inability to perform her job after lengthy training—would defeat her case. She has no evidence that this reason is a pretext. Plaintiff believes that the reason for her unsatisfactory work performance was Defendant's failure to provide her with adequate training. The record is flatly inconsistent with that notion. Far from depriving Plaintiff of an opportunity to obtain the training she needed, the evidence suggests that the FAA figuratively bent over backwards to give Plaintiff additional assistance: The FAA increased the maximum hours she would be allotted to certify on Local Control, allowed her to work with different trainers and evaluators, and delayed acting on repeated recommendations

to suspend and terminate her training. These efforts to supplement and improve Plaintiff's training are consistent with the Agency's manifest concerns over her unsatisfactory performance and lack of progress. Again, Plaintiff offers no evidence of any air traffic control trainee, male or female, afforded more training than she was.

After carefully considering the record, the court concludes Plaintiff has not presented evidence that creates a dispute of material fact concerning the legitimacy of Defendant's reason for terminating Plaintiff's employment. Defendant's motion for summary judgment on Plaintiff's claim of sexual discrimination is granted.

## C.    Plaintiff's Hostile Environment Sexual Harassment Claim

In order to prove a case of hostile work environment sexual harassment, Plaintiff must show: (1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or verbal or physical conduct of a sexual nature; (2) the harassment was based on sex; (3) the sexual harassment had the effect of unreasonably interfering with her work performance in creating an intimidating, hostile or offense working environment that affected seriously her psychological well-being; and (4) a basis for employer liability exists. *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998).

An actionable hostile work environment is created when the workplace is permeated with "discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive enough to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Not all unpleasant working conditions meet the abusive work environment test. The workplace that is actionable is the one that is "'hellish.'" *Perry v. Harris Chernin, Inc.*, 126 F. 3d 1010, 1013 (7th Cir. 1997), *quoting Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995). The "'occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers' would be neither pervasive nor offensive enough to be actionable.'" *Id.* In assessing the severity and

pervasiveness of the conduct, the court should consider the totality of the circumstances, including "the frequency of the discriminating conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with an employee's work performance." *Smith v. Sheahan*, 189 F.3d 529, 533-34 (7th Cir. 1999).

Plaintiff's allegations of harassment here are vague and general. As noted earlier, Plaintiff has offered no evidence of the dates or times of the allegedly hostile comments, has never identified the coworkers involved, and has presented no evidence at all that she made complaints concerning these comments to managers. Without such details, the court is unable to give any credit to Plaintiff's theory that the allegedly hostile environment she suffered affected her work performance in any tangible way. Even if she had provided greater detail, the court does not believe that any of the alleged conduct rises to the level of severity and pervasiveness present in those cases where courts have found a hostile environment. *Compare Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993) (plaintiff called a "dumb ass woman" to her face, asked to go to motel to negotiate her pay raise, asked to take coins from supervisor's pant pocket and asked if she promised a customer sex in exchange for business); *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807-08 (7th Cir. 2000) (plaintiff subjected to uninvited kiss, attempt to remove bra, and lewd proposition for sex); *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007 (7th Cir. 1994) (plaintiff called "whore," "cunt," and "split tail;" subjected to gender-related pranks such as cutting the seat out of her overalls and painting "cunt" on her toolbox; faced with coworkers exposing themselves and throwing burning cigarettes at her; and her was property defaced with pornographic pictures, signs, and graffiti).

The events described here are far less frequent, threatening, or disruptive. As noted above, Plaintiff asserts generally that she was subjected to a hostile work environment, but she offers only two specific examples: that there was a rumor that she had an affair with a

supervisor and that some male coworkers wondered whether she had breast implant surgery while she was on leave. The case law reveals that these alleged incidents do not meet the hostile environment standard. *See Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976 (7th Cir. 2000) (no actionable sexual harassment claim when supervisor made comments to plaintiff indicating that he would like to see her in sexually provocative outfits and asking her to look at photographs of women in bondage); *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996) (three offensive statements made within three months insufficient to support sexual harassment claim); *DiCenso v. Cisneros*, 96 F.3d 1004 (7th Cir. 1996) (no actionable sexual harassment found when defendant caressed plaintiff's arms and back and called her a "bitch" and a "whore"); *Baskerville,* 50 F.3d at 431 (no actionable sexual harassment claim when, over a period of seven months, supervisor called plaintiff a "pretty girl," made grunting noises, referred to masturbation and made other sexually charged comments to plaintiff); *Saxton v. American Tel. & Tel.*, 10 F.3d 526, 534 (7th Cir. 1993) (two incidents of supervisor's misconduct involving inappropriate remarks and impermissible touching did not give rise to actionable sexual harassment claim). Even if the court considers the correspondence Plaintiff attached to her brief (but did not incorporate or reference in any fashion), there is no actionable conduct here. A co-worker's comment concerning "collars" in the pool hall and a supervisor's "pink sky" comment would not breathe life into her claim if she had properly submitted them. They were too vague, innocuous and sporadic to support a hostile work environment claim.

Plaintiff cites a Third Circuit case, *Spain v. Gallegos*, 26 F.3d 439 (3rd Cir. 1994) for the proposition that rumors of an affair with a male supervisor sufficiently establish a gender-based hostile work environment claim to preclude summary judgment. *Spain* bears no resemblance to this case. In *Spain*, the plaintiff offered evidence that her supervisor himself created the conditions in which rumors developed by repeatedly and frequently following plaintiff around the

office and pestering her for a personal loan. *Id.* at 442-43. Reversing the district court's summary judgment in defendant's favor, the Third Circuit noted that this case was different from cases involving mere gossip amongst coworkers about an alleged office romance, because of the allegations that her supervisor's own improper conduct generated the rumors. *Id.* at 448-49.

To the extent Plaintiff has any evidence of a hostile environment at all, her case presents the "mere gossip" situation distinguished by the *Spain* court. Plaintiff does not suggest that her supervisor played any part in instigating, fostering or perpetuating the rumors. In fact, the court notes that one of the documents attached to but not referenced in her response brief is an affidavit that Plaintiff submitted in administrative proceedings in which she noted that the supervisor with whom she was rumored to have been having an affair reported the problem to the facility manager, who held a crew meeting to advise everyone to stop spreading the rumor. (March 22, 1995 Affidavit of Pamela Bloomer, Attached to Plf's Memo.)

Even viewed cumulatively, the alleged rumors, the alleged "wondering" about breast implants, the "collars only" and the "pink sky" comments, are simply not so severe or pervasive as to create an actionable hostile work environment. Defendant's motion for summary judgment on Plaintiff's hostile work environment claim is granted.

## D. Plaintiff's Retaliation Claim

To establish a prima facie case of retaliation, the Plaintiff must show: (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that there is a causal link between the protected activity and the adverse action. *Krause v. City of LaCrosse*, 246 F.3d 995, 1000 (7th Cir. 2001). The *McDonnell Douglas* burden shifting paradigm also applies to Plaintiff's retaliation claim. Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the Defendant to articulate a legitimate, non-

discriminatory reason for termination, and then back to the Plaintiff to show that the proffered reason is pretextual. *McKenzie*, 92 F.3d at 483.

Plaintiff alleges that she was terminated in reprisal for her prior EEO activity and filing of a union grievance. The record establishes that she engaged in protected activity, and that her supervisors Acres and Meadows were aware of the Plaintiff's activity. Plaintiff's claim fails, however, because there is no evidence of a causal connection between her protected sexual harassment complaint and the adverse action by her employer. In order to meet this requirement, Plaintiff must demonstrate that the Defendant "would not have taken the adverse action 'but for' the protected expression." *Adusumilli v. City of Chicago,* 164 F.3d 353, 363 (7th Cir. 1998). The record shows that the existence of prior EEO activity in the record was not a factor in Plaintiff's termination of training. Indeed, the prior instance of EEO counseling resulted in Plaintiff receiving 80 additional hours of training, thus increasing the chances of succeeding at the Local Control position.

Even drawing all reasonable temporal inferences in favor of Plaintiff on the evidence before the court, no reasonable fact finder could conclude that retaliation was a cause of Defendant's action. Defendant states, and the record shows, that the reason Plaintiff was terminated was because of her unsatisfactory OJT performance. Plaintiff was given every opportunity to pass OJT, even above and beyond what was required by the rules. Plaintiff was eligible to train for a maximum of 180 hours of OJT, but ultimately received in excess of 260 hours of OJT, as well as a number of other proficiency and refresher hours that were not counted. Plaintiff was given every opportunity to succeed, yet she was still unable to perform at a satisfactory level. The FAA would clearly have benefitted had she successfully completed OJT— it made an enormous investment of time and money in her as a trainee. Defendant's commitment to the flying public is, thankfully, more important. With Plaintiff's OJT summaries consistently documenting her unsatisfactory performance, Defendant had no choice but to

finally terminate her training. Plaintiff has not established a genuine issue of material fact suggesting her termination was in retaliation for her EEO complaints.

## CONCLUSION

Defendant's motion for summary judgment (23-1) is granted. Judgment is entered in favor of Defendant and against Plaintiff.

ENTER:

Dated: August 21, 2002

REBECCA R. PALLMEYER
United States District Judge